IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TROY ALAN ELLER,

                Plaintiff,

v.

CITY OF SANTA ROSA, et al.,

                Defendants.

NO. C09-01094 TEH

<u>ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT</u>

       This matter came before the Court on June 7, 2010, on Defendants' motion for summary judgment. Plaintiff Troy Alan Eller ("Eller" or "Plaintiff") brings this civil rights action against four Defendants – Tommy Isachsen ("Isachsen") and Kyle Philp ("Philp"), both officers with the Santa Rosa Police Department ("SRPD"), and the City of Santa Rosa ("City") and SRPD (collectively, "Defendants") – based on his arrest at Santa Rosa Memorial Hospital in the early morning hours of October 29, 2006. Eller alleges that Isachsen and Philp arrested him without probable cause and with excessive force. Defendants move for summary judgment, arguing that there was no constitutional violation and that they are protected by qualified immunity. For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part.

**BACKGROUND**

       The events surrounding Eller's arrest began late in the evening on Saturday, October 28, 2006, and spilled into the early morning hours of Sunday, October 29 – the weekend before Halloween. At the time, Eller was 39 years old, weighed approximately 300 pounds and stood 6'1". He suffered from epilepsy, which was noted on a medical alert bracelet that he wore, and had a cognitive disorder resulting from emergency brain surgery a decade earlier.

Eller consumed three beers at his apartment in Santa Rosa between 7 and 10:30 on Saturday night and walked to downtown Santa Rosa around 11:00 to observe the Halloween costumes and festivities. Eller was pushed to the ground as he attempted to navigate a rowdy crowd outside a bar, landing on his left knee and aggravating a previous injury; his hat was thrown into a bush. Eller waited at a gas station across the street until the crowd cleared out, then returned to retrieve his hat and begin walking home. However, his knee was inflamed and made walking difficult; he sat on the curb at the suggestion of a nearby police officer, who called an ambulance on his behalf.

The ambulance arrived at 1:12 am on October 29, at the corner of Mendocino Avenue and Cherry Street. According to paramedic Janet Doty's notations in the patient care report, Eller stated that he had been drinking heavily at a bar, was punched by someone while walking downtown, and fell to his knee due to alcohol. Doty noted that Eller was intoxicated, and that no other trauma was apparent. The only reason he gave for going to the hospital was hunger and a desire to sleep. Eller was transported by ambulance to Santa Rosa Memorial Hospital ("Hospital"), arriving at 1:34 am.

The emergency room at that hour was at "overflow" status, meaning the number of patients exceeded the number of beds. Eller was placed in a hallway on a gurney alongside the nurse's station, directly across from a series of patient rooms separated from him by only a light privacy curtain. Those rooms were occupied by an elderly woman with complaints of blurred vision and partial paralysis; a middle-aged man experiencing chest pains; and a child with a high fever.

Eller's account of what transpired within the Hospital differs in key respects from the version offered by Defendants and Hospital staff. According to Eller, the first member of the emergency room staff to examine him held open his left eye and shone a light into it, which made him uncomfortable; Eller protested, saying, "Leave me alone. Get the fuck out of here." Anne Musaelian, an emergency room technician, was later able to take his vital signs without incident. Dr. Ian Chuang also conducted an initial examination, concluding that he

was mildly intoxicated. Eller was instructed by nurses to remain on the gurney until a doctor could examine his knee.

Eller then recalls being approached by Isachsen. Eller explained that he needed to use the restroom, but Isachsen would not allow him to get up until he was seen by a doctor. Eller repeated the request, and Isachsen again refused. In his third attempt, Eller asked if Isachsen or a nurse could accompany him to the restroom, but Isachsen told him to "wait for the doctor." Finally, Eller slid himself onto his right leg while still leaning against the gurney and told Isachsen, "I gotta go." Eller recalls that Isachsen then shot him in the chest with a Taser from about an arm's length distance; Eller immediately fell to the ground, where Isachsen wrestled him down and restrained him in handcuffs. Eller experienced urinary incontinence during the commotion and wet his pants. Eller claims that the officers then dragged him out of the Hospital and to the patrol car, and took him into custody at the Sonoma County Adult Detention Facility. Eller contends that he suffered long-term scarring and loss of strength in his wrists as a result of the tight strapping of the handcuffs.

Defendants present a far more detailed account of what transpired within the emergency room. Mark Drafton, a hospital employee and licensed paramedic, was told by the paramedic who brought Eller into the hospital that Eller was "ETOH positive," meaning he was possibly drunk.[1] Drafton informed Eller that he would be taking Eller's vital signs, but Eller resisted, removing the blood pressure cuff and hanging it on the side of the gurney; Drafton tried again, and Eller again removed the cuff and said, "Fuck you." Drafton then informed the charge nurse, Louise Burns, that Eller was being uncooperative, and asked for others to watch Eller in the event Drafton needed help preventing him from straying into areas occupied by other patients.

According to Defendants, Eller then arose from his gurney and began walking toward Patient Room 3, which was directly across from his gurney. Drafton stood in Eller's way and asked him to return to his gurney. Eller replied, "Fuck you," and began to approach the

---

[1] "ETOH" is an abbreviation for ethanol (alcohol).

3

1 neighboring Patient Room 4, where again Drafton intervened and instructed him to return to
2 the gurney, which Eller finally did.  Musaelian was in Patient Room 4 at the time and heard
3 the commotion outside; she opened the curtain and saw Eller approaching her room as
4 Drafton and other staff members tried to get him to return to his bed.  Musaelian
5 characterized Eller's demeanor as "very assertive, aggressive, threatening," and said she was
6 scared of him.  Although Drafton did not fear for his personal safety, he was concerned about
7 the safety of the patients in the neighboring hospital rooms.  Drafton then made eye contact
8 with Isachsen and summoned him for assistance; Musaelian also recalls waving down
9 Isachsen and Philp, both of whom were in uniform and at the hospital for unrelated matters.
10 Isachsen noted in his incident report that he had heard staff telling Eller to lay down on the
11 gurney moments before both Drafton and Burns requested his assistance.

12 Isachsen initially approached and stood by without doing anything further, believing
13 that the presence of a uniformed officer by itself could resolve the matter.  He intervened
14 only after hearing emergency room staff ask Eller to remain in place and observing Eller
15 disobey those instructions.  Isachsen told Eller to slide back onto the gurney, said he could
16 not roam about the emergency room, and advised him that he could be arrested for causing a
17 disturbance in the emergency room if he failed to comply.  Isachsen never asked Eller why
18 he sought to get up from the gurney.  Eller responded, "Fuck you," slid off the gurney and
19 stood.  Isachsen then reached to grab Eller's right hand to place him in a twist lock and gain
20 his compliance, but Eller twisted backwards, appearing to swing at Isachsen.  Drafton
21 observed Eller lunge towards Isachsen.  Philp, on Isachsen's left side, tried to grab Eller's
22 left hand, but Eller pushed Philp backwards about three feet.  Eller himself came off balance
23 at that point, which allowed Isachsen and Philp to bring him to the ground.  Although
24 Isachsen told Eller to stop resisting and attempted to place him in handcuffing position, Eller
25 continued to ignore his commands.  As Philp attempted to get Eller's hands into handcuffs,
26 Isachsen warned Eller that he would use the Taser if Eller did not comply.  Eller again failed
27 to respond.

4

Isachsen withdrew his Taser, removed the tip, and deployed it on the upper right side of Eller's back as Eller rolled back and forth, which did not appear to have any effect; Isachsen redeployed the Taser lower on Eller's back, which was effective. According to Defendants, the Taser was deployed in "drive stun" mode, in which metal contacts are pressed directly against the suspect, releasing electrical energy that causes localized pain but does not disrupt the nervous system. The more debilitating Taser mode is "dart probe," in which two darts are fired over a distance of 20 to 25 feet, lodge into the skin with barbed hooks, and discharge a jolt of electrical energy that disrupts voluntary muscle control; that mode was not used on Eller, Defendants assert. The officers were then able to get Eller into handcuffs, using two sets of cuffs that were latched together due to Eller's large size.

Eller was again examined by Dr. Chuang, who did not chart or recall having removed any Taser dart probes or treating any puncture wounds on Eller's chest. He was discharged from the Hospital, transported to Sonoma County Detention Center, and charged with obstructing and assaulting a police officer, Cal. Pen. Code §§ 148(a)(1), 241. The criminal charges were dismissed after a hearing in state court on June 27, 2007.

Eller commenced this action in the Superior Court of California, Sonoma County, on October 29, 2008. The matter was removed to this Court on March 12, 2009. In addition to naming the present Defendants, Eller also brought claims against the Hospital and Drafton, which he voluntarily dismissed on March 1, 2010. He brings the remaining two claims for excessive force and unreasonable search and seizure pursuant to 42 U.S.C. § 1983. Defendants moved for summary judgment on April 19, 2010, and Eller opposed the motion.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The

5

Court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255. The Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then "set out specific facts showing a genuine issue for trial" to defeat the motion. Fed. R. Civ. P. 56(e)(2); *Anderson*, 477 U.S. at 256.

**DISCUSSION**

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures," and is applicable to the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Section 1983 imposes liability on a person who, under color of state law, "subjects, or causes to be subjected, any citizen . . . or other person . . . to the deprivation of any rights" guaranteed by federal law. 42 U.S.C. § 1983. Eller brings two claims under § 1983 for unlawful seizure and unreasonable use of force in violation of the Fourth and Fourteenth Amendments.

Defendants advance two bases for summary judgment in their favor. First, they argue that no constitutional violation occurred because the officers' detention of Eller – and their use of force in effecting that detention – were both objectively reasonable. Second, even if the facts could support a constitutional claim, Defendants contend that they are protected by

6

the doctrine of qualified immunity.  The Court begins by evaluating the officers' assertion of qualified immunity, which – if meritorious – would result in dismissal.  If this motion is not resolved on qualified immunity grounds, the Court will then decide if Eller's constitutional claims withstand summary judgment.

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  A police officer enjoys qualified immunity "unless the official's conduct violated a clearly established constitutional right."  *Pearson v. Callahan*, --- U.S. ----, 129 S. Ct. 808, 816 (2009).  "If the Officers' actions do not amount to a constitutional violation, the violation was not clearly established, or their actions reflected a reasonable mistake about what the law requires, they are entitled to qualified immunity."  *Brooks v. City of Seattle*, 599 F.3d 1018, 1022 (9th Cir. 2010).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Since the entitlement of qualified immunity is "an immunity from suit rather than a mere defense to liability," it is "effectively lost if a case is erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Supreme Court, in *Saucier v. Katz*, set forth a "two-step sequence for resolving government officials' qualified immunity claims."  *Pearson*, 129 S. Ct. at 815.  A court must first decide whether "the facts alleged show the officer's conduct violated a constitutional right," and if so, then asks "whether the right was clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 201-02.  A defendant does not receive qualified immunity if both questions are answered in the affirmative.  The Supreme Court later ruled in *Pearson* that the sequence of two steps, while "often beneficial," "should no longer be regarded as mandatory."  129 S. Ct. at 818.  In so ruling, the Court  acknowledged criticism of the two-step sequence as forcing courts "unnecessarily to decide difficult constitutional questions when there is available an easier basis for the decision (e.g., qualified immunity) that will satisfactorily resolve the case before the court."  *Id.* at 817-18 (quoting *Brosseau v.*

7

*Haugen*, 543 U.S. 194, 201-02 (Breyer, J., joined by Scalia and Ginsburg, JJ., concurring)). Judges should "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818.

This Court begins with the second prong, and asks whether Isachsen and Philp violated any "clearly established" right. For a right to be "clearly established" for purposes of qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Officials are entitled to immunity even if they "'mistakenly conclude that probable cause is present,'" so long as that mistake was reasonable. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Creighton*, 483 U.S. at 641). To assess qualified immunity, the Court must ask "the objective (albeit fact-specific) question whether a reasonable officer could have believed [the officers' actions] to be lawful, in light of clearly established law and the information the . . . officers possessed." *Creighton*, 483 U.S. at 641. Since Eller alleges two constitutional violations – an unlawful seizure, and the use of excessive force – the Court will ask this question of each.

## I.  Unreasonable Seizure

The Fourth Amendment's prohibition of unreasonable seizures is not limited to arrests, but rather applies to all seizures, which occur "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). The critical issue in assessing allegations of Fourth Amendment violations is reasonableness, for "what the Constitution forbids is not all searches and seizures, but *unreasonable* searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222 (1960) (emphasis added). The quantum of information that a police officer must possess to justify a seizure depends on the intrusiveness of the interaction. A mere "encounter" – which occurs when "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter" – is not a seizure at all and does not implicate the Fourth Amendment. *Florida v. Bostick*,

8

501 U.S. 429, 436 (1991); *see also Florida v. Royer*, 460 U.S. 491, 498 (1983) ("If there is no detention – no seizure within the meaning of the Fourth Amendment – then no constitutional rights have been infringed."). A "detention" – also characterized as an "investigatory stop" or a "*Terry* stop" – is a seizure that "fall[s] short of traditional arrest" and is governed by "a standard less than probable cause." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In that context, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *Id.* at 273 (quoting *Terry*, 392 U.S. at 30). "[R]easonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop." *Royer*, 460 U.S. at 498. The most intrusive variety of seizure is an arrest, which must be supported by probable cause. *United States v. Watson*, 423 U.S. 411, 417 (1976). An arrest has occurred "where force is used such that the innocent person could reasonably have believed he was not free to go and that he was being taken into custody indefinitely." *Kraus v. County of Pierce*, 793 F.2d 1105, 1109 (9th Cir. 1986). A court must consider the "totality of the circumstances" to determine if an individual "was arrested or merely detained." *United States v. Bravo*, 295 F.3d 1002, 1010 (9th Cir. 2002).

It is undisputed that Eller was subject to seizure from the moment Isachsen ordered him to remain on the gurney. What the parties dispute is the character of that seizure. Defendants argue that Eller's initial confinement to the gurney constituted an investigative stop, for which the officers needed only a reasonable suspicion of criminal activity. Defendants assert that Isachsen satisfied this standard based on his reasonable suspicion that Eller willfully resisted or obstructed an emergency medical technician in discharge of his duty (Cal. Pen. Code § 148); that he was publicly drunk (Cal. Pen. Code § 647(f)); and that he violated the rules of a health care facility and engaged in trespass (Cal. Pen. Code §§ 602, 602.1, and 602.11). Eller argues that confinement to his gurney constituted an arrest and therefore was unconstitutional absent a showing of probable cause.

Since this issue is before the Court on the question of qualified immunity, the Court must ask whether a reasonable officer would have believed that Eller's confinement to the

9

gurney constituted a lawful investigatory stop. To make a so-called "*Terry* stop," there must be "articulable facts supporting a reasonable suspicion that a person has committed a criminal offense." *Hayes v. Florida*, 470 U.S. 811, 816 (1985); *see also Terry*, 392 U.S. at 21. "Reasonable suspicion" is a low bar that may be satisfied, for example, by three men's "oft-repeated reconnaissance of [a] store window" (creating reasonable suspicion that they were planning a daylight robbery), *Terry*, 392 U.S. at 6, 28, or by a driver sleeping behind the wheel of a car at 8pm, breathing rapidly, and responding testily to an officer's inquiry (creating reasonable suspicion that he was under the influence of illegal stimulants), *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1021 (9th Cir. 2009). A "brief stop," which allows the officer to "maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 146 (1972).

Isachsen's statements to Eller – explaining that he could move once he was seen by a doctor – made clear that his detention was only temporary. Since a reasonable person would not have believed that he was being taken indefinitely into custody at that time, the seizure did not rise to an arrest. Isachsen therefore needed only a reasonable suspicion of criminal activity to justify Eller's detention.

The undisputed facts establish that multiple members of the Hospital staff sought the assistance of Isachsen and Philp in subduing Eller. Both Drafton and Musaelian testified that they had summoned the officers by making eye contact or waving them down, and Isachsen's incident report indicates that Burns and Drafton approached him for help. Eller offered no evidence refuting these accounts. At that point, a reasonable officer could have concluded that an investigatory stop was justified by the reasonable suspicion that criminal activity was afoot – for example, that Eller had violated California Penal Code section 148 by resisting or obstructing an emergency medical technician. Restricting Eller to the gurney was necessary "to allow the officer to pursue his investigation without fear of violence." *United States v. Taylor*, 716 F.2d 701, 708 (9th Cir. 1983). "Police officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations." *Allen v. City*

10

*of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).  Officers need not avail themselves of the "least intrusive means of responding to an exigent situation," but rather must act reasonably under the circumstances.  *Id.*

Isachsen's conduct in detaining Eller at that point was a reasonable response justified by concern for the safety of other patients and staff.  In an overcrowded hospital setting, an unruly patient could threaten or harm individuals, damage equipment, and cause hazardous conditions.  Since a reasonable officer would have believed such a seizure to be lawful, Isachsen and (to the extent he was involved) Philp have qualified immunity over Plaintiff's unlawful seizure claim based on his confinement to the gurney.[2]

The seizure inquiry does not end there, however.  Even if Eller was initially only subject to an investigatory detention, Defendants do not dispute that the interaction escalated to an arrest once the officers used force to physically restrain him.  At that point, probable cause was clearly required.  "[A]n arrest without probable cause violates the fourth amendment and gives rise to a claim for damages under § 1983."  *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988).  For Isachsen and Philp to benefit from qualified immunity for the arrest, Defendants must demonstrate that reasonable officers would have believed the arrest to be supported by probable cause.  "The test for probable cause is whether facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person, or one of reasonable caution, to believe, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense."  *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005).  "The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest."  *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

---

[2] Eller argued at hearing that, since Isachsen did not even question Eller during his detention, no investigation was conducted and his seizure could not be justified as an *investigatory* detention.  However, such detentions are also justified by the need to maintain the status quo and ensure the safety of the officers and those around them.

11

1    Defendants argue that Isachsen had probable cause to arrest Eller "for obstruction"
2 once he defied Isachsen's orders.  A violation of California Penal Code section 148(a), for
3 obstructing a peace officer, is comprised of three elements: "(1) the defendant willfully
4 resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the
5 performance of his or her duties, and (3) the defendant knew or reasonably should have
6 known that the other person was a peace officer engaged in the performance of his or her
7 duties."  *People v. Simons*, 42 Cal. App. 4th 1100, 1108-09 (1996).  Again, for purposes of
8 qualified immunity, the key question is whether a reasonable officer would have concluded
9 that he had probable cause to arrest Eller at this point.  Both Eller and Defendants agree that,
10 immediately before his arrest, Eller defied Isachsen's order to remain on the gurney – thereby
11 obstructing a uniformed officer while he was clearly engaging in the performance of his
12 duties.  Although Eller contends that he only stood to use the restroom, those facts do not
13 alter the calculus for probable cause.  It is not unreasonable for an officer engaged in an
14 investigatory stop to momentarily deny a request to use the restroom until the detention is
15 complete.  From a reasonable officer's perspective, it was lawful to escalate the investigatory
16 stop to an arrest for obstruction once Eller acted contrary to Isachsen's orders.  Isachsen and
17 Philp therefore have qualified immunity with respect to Eller's claim for unlawful seizure,
18 and summary judgment is GRANTED to Defendants as to this claim.

## II.     Excessive Force

For allegations of unreasonable force in violation of the Fourth Amendment, "the qualified immunity inquiry is the same as the inquiry made on the merits."  *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Hopkins v. Andaya*, 958 F.2d 881, 885 n.3 (9th Cir. 1992)).  Excessive force claims are judged under an "objective reasonableness" standard, *Scott v. Harris*, 550 U.S. 372, 381 (2007), which entails "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citations and quotation marks omitted).  The reasonableness standard evades

"precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). As a result, assessing whether any given use of force is reasonable "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "These factors should be considered in relation to the amount of force used." *Brooks v. City of Seattle*, 599 F.3d 1018, 1025 (9th Cir. 2010). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

The issue of excessive force is independent from that of probable cause. Force is not automatically unreasonable simply because probable cause is lacking. *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004). "Indeed, an arrestee's resistance may support the use of force regardless of whether probable cause existed." *Brooks*, 599 F.3d at 1022. "The absence of probable cause does not grant an individual the right to offer resistance." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001).

Defendants characterize the conduct of Isachsen and Philp as an appropriate "escalation of force," beginning with an officer's uniform presence and increasing to verbal tactics, firm grip, physical force, and finally an eight-second application of the Taser in drive stun mode. They also stress that the Taser was used only in the drive stun mode, representing a far lower quantum of force than the dart probe mode. *See Brooks*, 599 F.3d at 1027 ("The use of the Taser in drive-stun mode is painful, certainly, but also temporary and localized, without incapacitating muscle contractions or significant lasting injury."). In *Brooks*, the Ninth Circuit concluded that it was not unconstitutional to deploy a Taser three times in drive-stun mode against a pregnant woman who refused to sign a notice of infraction during a traffic stop. The court characterized *Brooks* as presenting a "less-than-intermediate use of force, prefaced by warnings and other attempts to obtain compliance, against a suspect

accused of a minor crime, but actively resisting arrest, out of police control, and posing some slight threat to officers." *Id.* at 1030-31. In light of *Brooks*, Defendants argue, the use of force by Isachsen and Philp was clearly not a constitutional violation.

Eller's account of the force used differs in several respects from that of Defendants, however. First, Eller contends that the Taser was deployed in immediate response to his standing up, without any kind of warning or escalation in force. Eller also claims that the Taser was used in dart probe mode – which causes "intense" pain that "is felt throughout the body" and "is administered by effectively commandeering the victim's muscles and nerves," *Bryan v. McPherson*, 590 F.3d 767, 774 (9th Cir. 2009) – and that he was struck in the chest rather than the back.

Construing the facts in a light most favorable to Eller, the Court cannot conclude that the officers are entitled to qualified immunity on the excessive force claim, nor can it resolve the question of whether there was a constitutional violation. A reasonable officer would not have concluded that the immediate deployment of the Taser, without warning – as Eller alleges occurred – was appropriate in this context. "[W]arnings should be given, when feasible, if the use of force may result in serious injury." *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001). Because an inquiry into excessive force "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). "This is because such cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). "[W]hether the force used to effect an arrest is reasonable is ordinarily a question of fact for the jury. Although excessive force cases can be decided as a matter of law, they rarely are because the Fourth Amendment test for reasonableness is inherently fact-specific." *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2001) (internal citations and quotation marks omitted). Summary judgment is therefore DENIED as to this claim.

14

### III. Municipal Liability

Eller also seeks to hold the City and SRPD liable for the constitutional violations alleged. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Municipal liability in § 1983 actions is "only appropriate where a plaintiff has shown that a constitutional deprivation was directly caused by a municipal policy." *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001). Four conditions must be satisfied to hold the municipality liable for failing to act to preserve constitutional rights: "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996) (internal citations and quotation marks omitted).

On the date of Eller's arrest, the SRPD's policy on the "use of force" and the "use of advanced tasers" was set out in two general orders. Following the arrest, a supervising officer with the SRPD concluded that Isachsen's use of the Taser was in compliance with that policy. Defendants argue that no evidence suggests that the policy amounts to a "deliberate indifference" to Eller's constitutional rights. Eller contends that, since the SRPD determined that the officers' use of force complied with its policy, the policy must be the "moving force behind" the alleged constitutional violations. Eller also points out that Isachsen is a defense tactics instructor for the SRPD, meaning he instructs others on the use of the Taser – which Eller treats as evidence that the SRPD fails to properly train its officers on the use of force.

The Court agrees with Defendants that Eller has failed to present any evidence to satisfy the "deliberate indifference" inquiry. The use of force policy sets forth the standard for reasonable force under California Penal Code section 835a and the Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386, 388 (1989), and instructs officers on compliance with those standards. Even if Eller were to prevail on his excessive force claim before a jury, a "plaintiff cannot prove the existence of a municipal policy or custom based

15

solely on the occurrence of a single incident or unconstitutional action by a non-policymaking employee." *Nadell*, 268 F.3d at 929. The SRPD's conclusion that appropriate force was used here, and Isachsen's training of other officers on the use of force, do not suggest that the municipality has a policy amounting to deliberate indifference to Eller's constitutional rights. Eller has failed to set out any facts showing a genuine issue for trial on the question of municipal liability. Summary judgment is therefore GRANTED to Defendants on this issue.

**CONCLUSION**

For the reasons set forth above, summary judgment is GRANTED to Defendants on the unlawful seizure claim and the issue of municipal liability, but DENIED as to the excessive force claim.

**IT IS SO ORDERED.**

Dated: 6/10/10

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT